THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. THOMAS GUILFOYLE, Plaintiff in Error.

*Opinion filed April 23, 1926.*

1. CRIMINAL LAW—*what is evidence of intent to commit rape in prosecution for assault.* In a prosecution for assault with intent to commit rape the specific intent charged must be proved beyond a reasonable doubt, but the intent of the accused may be shown by his actions and words and by the surrounding circumstances, and the fact that during the assault the accused attempted to commit the crime against nature *per os* is evidence of an intent to commit rape.

2. SAME—*abandonment of purpose does not relieve defendant of crime of assault to commit rape.* In a prosecution for assault with intent to commit rape, if it is shown that at any time of the unlawful assault the defendant intended to commit rape, the fact that he afterwards abandoned his purpose will not relieve him from liability.

3. SAME—*when voluntary complaint of prosecutrix is admissible.* In a prosecution for assault with intent to commit rape, evidence of a voluntary complaint of the prosecutrix is admissible if the assailant is not named and if the complaint is made within a reasonable time and without details.

4. SAME—*when error in admission of evidence does not require reversal.* Where the competent evidence shows, beyond all reasonable doubt, that the defendant is guilty in a case where the jury are not the judges of the penalty to be inflicted but only of the question of guilt or innocence, error in the admission of evidence will not ordinarily reverse a judgment on a verdict of guilty.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN P. McGOORTY, Judge, presiding.

WILLIAM SCOTT STEWART, and W. W. O'BRIEN, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and MERRILL F. WEHMHOFF, (EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error was indicted in the criminal court of Cook county for assaulting one Edith Draeger, a female, with intent to ravish and carnally know her. On his plea of not guilty there was a trial by jury. The jury found him guilty, and the court entered judgment on the verdict, sentencing him to the penitentiary after overruling his motion for a new trial. This writ of error is prosecuted by plaintiff in error for a review of the judgment.

Plaintiff in error asks for a reversal of the judgment on three alleged grounds: (1) That the court erred in admitting incompetent evidence against him; (2) the court erred in overruling his motion for a new trial; and (3) the verdict is not sustained by the evidence.

The facts testified to by the prosecutrix, Edith Draeger, are the following: She was an employee as a supervisor of the telephone company in Chicago and had been for eleven years. About ten o'clock P. M., February 2, 1924, she met for the first time plaintiff in error, Thomas Guilfoyle, (hereinafter referred to as the defendant,) being introduced to him as "Mr. Burke" by Margaret Farry, another employee of the telephone company. Miss Draeger was told by Miss Farry they were going to the Rainbow cafe. The three then went into an ice cream parlor at Robey and North streets, in Chicago, where they waited for and met a Mr. Larson, a traffic policeman of Chicago. It also appears from the record that Guilfoyle was a policeman. The party of four went to the Erie cafe, on Clark street, where they had a drink of ginger ale with something else in it. Some policemen then came in and took something from the defendant and Larson and advised them to leave the place. The party then proceeded to the city hall, arriving there about 11:30 or 12:00 o'clock. The two girls went to a washroom on the tenth floor, and after they came out of that room Larson and defendant talked to a one-

armed colored man, who handed defendant a newspaper package for which he gave the colored man some money. She had an idea what was in the package but did not know what it was. The record discloses that it was whiskey or some kind of intoxicating liquor. They all then went to a cafe on the South Side,—the Rex. They engaged in dancing there, and when they were not dancing they had a few drinks out of the package the defendant obtained from the colored fellow. Miss Draeger had never before been at the Erie or the Rex. They left the Rex about 4:30 A. M., and up to that time she had had no quarrel with the defendant and they had had a fairly nice time. She was perfectly sober when she left the Rex. The defendant said he was going to take her home, and he and she, unaccompanied by the other two of their party, got on a north-bound State street car and went to the city hall. She intended to wait outdoors for the defendant. The hall was deserted, and the defendant said to her that it would be better for her to go up-stairs, as some stranger might want to talk to her on the street. The same colored man that they had met there the evening before took them up-stairs to the tenth floor. She had on a heavy, black winter coat, and the defendant, while they were standing in front of the elevator on the tenth floor, asked her to go into a certain room, and she refused to do so. The defendant then said, "I am going to make you go into that room," and grabbed her by the throat, and she struggled there with him for twenty or thirty minutes. She then stated: "He finally got me down to the floor and was choking me, and said, 'You spread your legs or I will put this in your mouth,' and he kept on saying, 'Now I will show you before you get away from me,' and things like that, and finally he came to my mouth with it, and I just kept on fighting him, and finally I got up, and I was crying." She told him she would give him her wrist watch if he would leave her alone, and gave him her watch. He took it and then decided to go after

her again. She then offered to give him her ring. He
hesitated, and she pushed him back about three feet and
then ran down two flights of stairs while he was chasing
her. In the struggle she lost both of her shoes or slippers,
her hat and coat and was bloody from head to foot. After
she ran down-stairs she screamed as loud as she could. He
caught her, punched her as hard as he could, and said, "You
will holler!" He kept saying that, and she kept putting her
head down because he was hitting her "terribly." Finally
he got her down on her knees on the floor and kicked her
in the side. She then got up and ran to the elevator and
pushed the button. She was afraid to wait because he was
right after her. She ran down the steps to the first floor,
and when she got down there saw two colored men but was
afraid to go to them. She ran to the doors and they were
locked. Just at that time she saw a white man go into the
elevator and ran to him and he took her up-stairs to the
chief's office. During her struggle with the defendant she
told him she had never done anything like that before, and
he replied, "I don't care if you never did; you are going
to lay here cold; you are not going to get out of this
place until you do." After she got out of this struggle
with the defendant she went to the hospital and had three
stitches put in her lip that was split and bruised and torn
by the defendant's blows. For three weeks she lay with
applications on her face all the time. Both sides of her
face were bruised and showed cuts from his punching her,
for three months. She had marks on her neck from his
choking her.

When the defendant and the prosecutrix were on the
street car after they had left the Rex cafe the defendant
told her that he had to stop at the city hall to make a re-
port, and he had stated that to her several times during the
evening before they started to the city hall from the Rex.
The prosecutrix's testimony concerning this crime is dis-
puted by no one. She is corroborated as to what took

place at the city hall on the morning of February 3 by Casey
Davis, night watchman at the city hall, and Jerome J. Mc-
Grath, a patrolman at the city hall, both of whom heard
her screams about 4:30 or 5:00 o'clock, when the defend-
ant attacked her on the tenth floor.   The former testified
that he saw the prosecutrix and the defendant on the even-
ing of February 2, when they first went to the city hall,
and on the next morning, when they returned.   When she
first went up in the elevator on the evening of February 2,
and on her return the next morning, he did not see any
scratches or bruises on her face at that time and did not
notice anything unusual about her as she went up the ele-
vator the second time, except that she appeared to be ex-
cited and that she did not appear to him to be drunk.   He
heard her screams on the tenth floor and took the elevator
for that floor, where he found both of her slippers and the
defendant, and said to him, "What the hell is going on up
here?" and he replied, "You see that lady?"   The defend-
ant asked him then to give him her shoes, and he got on
the elevator and ran it down, looking for the prosecutrix as
he passed each floor.   They found the prosecutrix on the
main floor with nothing on her feet but her stockings.   She
ran up to a white man there was there and said to him,
"Help me!"   She then tried to run out of the door, but
she could not get out as the doors were locked.   The de-
fendant gave him her coat and hat and slippers and went
on out but said nothing.   The prosecutrix then put on her
slippers and went up the elevator with him to the chief's
office, where she bathed her face in cold water.   He stated
that she was then bleeding from the mouth and that there
were scratches on her arm and neck, and that her face was
also bleeding and badly swollen.   McGrath also testified
that her face was very badly bruised and swollen; that the
right side of her dress was torn and her underclothes were
showing, and that the blood was streaming from her mouth
and that her right eye and face were swollen and were black

and blue. The prosecutrix is also corroborated by a number of other witnesses who saw her, some of them on the early morning of February 3 and some of them two or more days later, all of whom testified to the bruised and blackened and swollen condition of her face and eyes. A photographer took her photograph two days after the struggle took place, which appears in the record and shows the condition of her face testified to by the witnesses.

Only one witness testified for the defendant, and that witness was Margaret Farry. She testified the prosecutrix had been drinking and that she was drunk when she left the Rex cafe on the morning of February 3, and that as they were leaving the Rex Miss Draeger fell down the steps at that restaurant. She also testified that she herself did not have any drinks except ginger ale. She described Miss Draeger's fall down the steps in this language: "She slipped on the first step at the top of the stairs. She slid three or four steps and sat down. I helped her up with Guilfoyle's assistance." The prosecutrix denied this statement that she fell on the steps at the Rex, and further stated that she did not fall when she was running down the steps from the defendant at the city hall.

The main contention of the defendant in this case is that the evidence in the record does not warrant the finding of the jury that the defendant was guilty of an assault with intent to commit rape on the prosecuting witness; that the evidence only shows that he was guilty of an attempt to commit the crime against nature *per os,* and that there is no showing, beyond a reasonable doubt, that an intent to commit rape is proved, as charged in the indictment. We have carefully read and considered this record. We have not quoted or stated all of the revolting language and conduct of the defendant that appears in the record but have stated sufficient of it to show its general trend. It is conceded by the defendant's counsel that the defendant is guilty of robbery of the prosecutrix, of assault with intent

to commit the crime against nature aforesaid, and that he brutally and unmercifully beat her up because she did not yield to his fiendish desires. The evidence does show that he was guilty of all the crimes aforesaid, and it also clearly shows that he is guilty of the crime charged in the indictment, and that his threats to commit and his attempts to commit the crime against nature were made with a view of inducing and compelling the prosecutrix to submit to his attempts to commit the crime actually charged in the indictment, and that all the other crimes committed by him are none of them matters of defense but of aggravation, and the assaults and batteries and the other assault are evidence of the specific intent to commit the offense charged in the indictment.

We recognize as a principle of law that in a charge of an attempt to commit rape that it is absolutely necessary to prove the specific intent charged beyond all reasonable doubt, and we have no hesitancy in saying that the specific intent charged in this indictment was so proven and that there can be no real question of the defendant's guilt as charged. The intent of a party in an assault with intent to rape is gathered from his actions and his words and the surrounding circumstances. (*People* v. *Makovicki,* 316 Ill. 407.) The law is also that if there was at any time of the unlawful assault by the defendant an intent to commit rape, the fact that the defendant afterwards abandoned his purpose will not relieve him from liability. (*Franey* v. *People,* 210 Ill. 206.) The evidence really shows that the defendant only abandoned his intention to commit the crime charged in this indictment when he realized that he was not physically able to accomplish his dastardly purpose. He then resorted to a threat and an attempt to commit the crime against nature for the purpose of accomplishing the original act that he at first attempted,—of sexual intercourse with her by force and against her will.

In cases where an assault with intent to rape is charged, evidence of a voluntary complaint of the prosecutrix is admissible if the name of the assailant is not named and if the complaint is made within a reasonable time and without details. (*Stevens* v. *People,* 158 Ill. 111; *People* v. *Hamilton,* 268 id. 390; *People* v. *Marx,* 291 id. 40.) It is argued that the People in this case introduced the complaint of the prosecutrix, which complaint was merely given and testified to by her as a mere evidentiary fact, and that such complaint was not voluntary but was elicited from her by means of questions bearing directly on that question. We are inclined to the conclusion that her first complaint made right after she got away from the defendant, and which statements were made on the morning of February 3, were voluntary statements; but that there were similar statements made by her later that were of the character of which the defendant's counsel complain, and that the admission of such complaints was error but not reversible error. In this case the only question for the jury to settle was merely the question of whether or not the defendant was guilty of the crime charged. The jury did not have the duty, under the law, of passing on the question of the penalty and the extent of the penalty to be administered to the defendant. Where the competent evidence shows, beyond all reasonable doubt, that the defendant is guilty in a case where the jury are not the judges of the penalty to be inflicted upon the defendant, error will not ordinarily reverse the judgment rendered on their verdict. *People* v. *Burger,* 259 Ill. 284.

The judgment and sentence of the court are affirmed.

*Judgment affirmed.*