THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK FRANK, Plaintiff in Error.

*Opinion filed October 22, 1927—Rehearing denied Dec. 8, 1927.*

1. CRIMINAL LAW—*what necessary to justify a new trial for newly discovered evidence.* Newly discovered evidence must be evidence that is material to the issues, and it must be not merely cumulative but convincing that an unjust verdict has been rendered and that a different verdict would in all probability be rendered by another jury before it can be regarded as sufficient to warrant the court in setting aside the verdict and granting a new trial.

2. SAME—*intent to kill may be proved by circumstances.* Intent to kill may be determined by the facts and circumstances proved on the trial, including the declarations or acts of the defendant.

3. SAME—*evidence tending to show motive is relevant—threats.* It is not absolutely necessary to prove a motive for homicide but evidence that tends to show that the defendant had a motive for assaulting and killing his victim is always relevant, as it renders more probable the inference that he did commit the assault or the homicide; and in a prosecution for murder, evidence of threats made prior to the commission of the crime is relevant to show malice and to show deliberation and due meditation if made long before the crime was committed.

WRIT OF ERROR to the Circuit Court of Sangamon county; the Hon. NORMAN L. JONES, Judge, presiding.

JOHN G. FRIEDMEYER, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, H. E. FULLENWIDER, State's Attorney, and MERRILL F. WEHMHOFF, (J. M. WELDON, and L. E. SULLIVAN, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Frank Frank, of the age of twenty-seven years, was found guilty in the circuit court of Sangamon county of an assault with intent to murder Leong Ling. Motions for a

new trial and in arrest of judgment were overruled and he was adjudged to serve an indeterminate term in the penitentiary. This is a writ of error prosecuted by plaintiff in error, herein called defendant.

On September 21, 1925, Leong Ling, a Chinaman, was the owner of a laundry at No. 117 South Fourth street, in Springfield, Illinois, and had been doing a laundry business at that place for some time. He had known the defendant, Frank Frank, who is also a Chinaman, for three or four years and had met him a number of times in that part of the city of St. Louis, Missouri, known as Chinatown, and the last time he met him there previous to September 21, 1925, was at the On Leong Tong Club. The defendant told him at that meeting that he could not run a laundry in Springfield in opposition to the laundry operated by the On Leong Tong, and that if he did do so, "We will kill you if you don't get out." On the date aforesaid, about six o'clock A. M., the defendant entered Ling's laundry in Springfield with a bundle under his arm. Ling recognized him at once and said to him, "Good morning, Huey John." Huey John is the Chinese name for the defendant, and he is addressed by that name by all Chinamen who know him. His American name, however, is Frank Frank. Ling was sitting in a chair in his front room, behind a counter about three feet high, at the time the defendant entered his place, and without saying anything whatever to Ling he advanced into the room and up to the counter to from three to five feet of him and fired three shots at him with a .38 Smith & Wesson revolver, which he drew from a pocket on his right side. The first shot missed Ling, the second shot struck him in the chest and pierced the upper part of his right lung, and the third entered his left arm, near the shoulder. After he was shot Ling walked toward the back room of his laundry, in which there was a small boy sleeping and in which Ling had a bed where he slept. The defendant was then standing near the center of the front

room and watched Ling until he got into his bed-room, and then left the place. He never spoke a word while he was in the front room. The On Leong Tong Club was running a laundry in Springfield at the time of the shooting and had been doing so some time prior thereto. The defendant's face was painted with black grease-paint or some other black substance when he went into the laundry to shoot Ling, but Ling recognized him at once as he walked into his place. A number of policemen and a great number of people gathered at the laundry immediately after the shooting, but there was no one in the laundry at the time of the shooting but the defendant, Ling and a small boy. The defendant's .38-caliber revolver was found near the center of the front room of the laundry after the shooting, but it was not produced at the trial for the reason that it was taken by unknown parties while the police were looking after and caring for Ling.

The following additional facts were elicited on the trial by the People from the testimony of Lawrence Byrd, a colored man who owned and drove a Hudson sedan service car in St. Louis and who was indicted in Springfield for an offense of some character for the unlawful assault against Ling, which is not made definite by this record, to-wit: He met the defendant in St. Louis in the early part of the night of September 20, 1925, and agreed to drive him to Springfield for $30, but informed the defendant he could not start on that trip before two o'clock the next morning, which was satisfactory to the defendant. They left St. Louis about two o'clock the next morning, arriving in Springfield about six o'clock. Byrd was directed to drive the defendant to Ling's laundry, on Fourth street. On their arrival there Byrd stopped his car about ten feet from the front door of the laundry but not directly in front of it, and his motor continued to run as his machine stood there. The defendant, who had been lying down in the back seat all the way from St. Louis, got out of the car with a bundle

under his arm and went into the laundry and remained. there about a minute and a half or two minutes. Byrd had gotten sleepy on the trip and had stopped his car once or twice and slept at the side of the road. He had not paid any attention to the defendant or to his appearance while they were riding to Springfield and did not pay very close attention to him when he got out of the automobile and went into the laundry. He saw nobody else go into the laundry and did not see anybody come out of it, either before or after the defendant went into it. He heard two of the shots that were fired in the laundry, but was not sure at that time whether they were gunshots or the explosions from some automobile. Immediately after Byrd heard the shots the defendant ran out of the laundry, got into Byrd's car and ordered him to drive to St. Louis. As he came out of the laundry Byrd noticed for the first time that his face was black and that he was not dressed as he was the night before when they started for Springfield. He had on a cap and a blue shirt as he came out of the laundry. He also noticed that as he came out of the laundry he did not have any bundle with him. As they were driving from Springfield to Carlinville on their way to St. Louis the defendant got all the black paint off of his face, and his face then looked clean and bright, with the exception that a little bit of the black showed around his neck and on his collar and around his eyes and on his eyebrows. It further appears from the testimony of Byrd and some of the Carlinville police and the Springfield police, that when Byrd and the defendant arrived at Carlinville a policeman faced them with a riot gun, compelled them to get out of the automobile and took charge of them as prisoners. As the defendant was getting out of the front seat of the car a .32 automatic Harrington & Richardson revolver fell out of the car onto the running-board, directly under the seat of the automobile in which the defendant had been riding. This revolver was fully loaded. It was not shown that this

revolver was in the defendant's hand or in his possession otherwise than as shown by the circumstances aforesaid. Byrd further testified that he never had a gun in that car on that trip or in his possession. In court he identified the revolver and stated that he saw it after it had fallen out of the car and that it did not fall from the cushion of the automobile as explained by the defendant, and stated if it had it would have fallen on the floor of the car and not out of it. The defendant never informed him of the purpose of his trip to Springfield.

The defendant testified in his own behalf substantially as follows: He is a cook by profession and has also worked in laundries. He was not connected with the laundry troubles which occurred in Springfield. He met Leong Ling in St. Louis, has known him three or four years and they were on friendly terms. In February, 1924, Ling borrowed $150 from him and has owed it ever since. He hired Byrd, the colored man, for $30 to drive him to Springfield, and they started from St. Louis on that trip after two o'clock in the morning and arrived in Springfield about daylight on the morning of September 21, 1925. He was never in Ling's laundry before that day. His only purpose in going to Springfield was to ask Ling for the money he owed him. When they left St. Louis he had on a raincoat, a straw hat and a white shirt. He had with him a .38 Smith & Wesson revolver. When he got to Springfield he directed Byrd to drive to Ling's laundry, on Fourth street. When they got there he went into the laundry and asked Ling for "the debt." As he entered the laundry Ling was sitting on a chair behind a counter. Ling stood up and said, "Good morning, Huey John," and he said, "Good morning." Ling asked him what he came for, and he told him he came to collect the money Ling owed him. Ling replied that he had no money to pay him, and then told him to get out and threw Chinese ink in his face,—just a little ink as he turned his head, and it struck

his face but did not splash on his clothes at all. He asked Ling why he threw ink in his face. Ling said, "Not only throw the ink on your face, I will shoot you son-of-a-bitches to death," and then reached for his gun. As Ling brought his revolver up he shot at the defendant, and he dodged and shot at Ling. Ling staggered back a little and tried to raise his gun again. Defendant then again shot at Ling. Ling then walked back near the partition in the rear of the laundry and stood there. The defendant then walked out to the automobile. He got confused in his mind while he was in the laundry and thought he dropped his revolver on the street somewhere. He didn't have it when he got' in the automobile. After he got into the automobile and on his way to Carlinville he wiped the Chinese ink off of his face. When he had gotten about three miles out of Springfield he felt with his hand at the side of the cushion the .32-caliber revolver offered in evidence. He thought it was his, but when he looked at it he saw it was not his and laid it back, and when he got out of the automobile at Carlinville, where they were arrested, it fell out of the automobile. He never had it in his pocket and never saw it before that time. When Ling shot at him he was between Ling and the front window of the laundry, but he did not hear any glass break. He shot Ling to save his own life, but he did not tell any of the officers in Springfield or any other person after he was arrested that he shot Ling to save his own life. He did not have any bundle of clothing with him when he left St. Louis and did not have any bundle with him when he came out of the laundry or when he went into the laundry. When he got into the laundry there was a bundle on the counter. He "happened" to place his hand on this bundle. He had no clothing on that trip except what he wore. He had no cap with him. He had a straw hat on when he went into Ling's laundry. He saw no other person in the laundry except Ling. He could not give any description at all of Ling's revolver.

One or more of the police officers testified that when they went to Ling on the morning he was shot he told them that a black man shot him and he did not know him. They also testified that Ling was in very great agony at that time and that he used the Chinese language when he was talking and that they could not understand him. Both the defendant and Ling testified through interpreters because they could not speak English. On rebuttal Ling stated that he did not say much to the officers and did not understand what they were saying to him. He also stated that he never had owed the defendent any money and did not owe him any the day he was shot; that he did not throw any ink at or on the defendant, and that he did not have a revolver in his hand or in his place of business on that day.

On his motion for a new trial the defendant relied on newly discovered evidence to support it, the same being disclosed by an affidavit of John Bradley, which is substantially as follows: About seven o'clock A. M. of September 21, 1925, he was returning from Ballard & Johnson's restaurant, on Fourth and Washington streets, and was walking south on the same side of the street on which the laundry is situated. As he approached the laundry he saw a man cross the sidewalk and go into the laundry. When Bradley reached the doorway of his apartment building, which is next door south of the laundry, he heard two men talking loudly to each other in the Chinese language. Bradley then looked through the door of the laundry and saw Ling pick up a bottle, or something of that nature, and throw it at a man who was standing in front of the counter. Ling then ducked down behind the counter and shot once at the man in front of him. The man in front of him then drew a gun from his pocket and fired at Ling. Bradley opened the door leading to his apartment and then heard another shot fired in the laundry. Immediately thereafter a slim man, wearing a straw hat, came running out of the laundry and seemed to be wiping something from his face which

Bradley thought was blood. Bradley then went up to his room. He had known Ling for about three years.

Fourth street in Springfield runs north and south. The laundry and Bradley's apartment building face east upon Fourth street. The apartment building is immediately south of the laundry building and on the west side of Fourth street. The restaurant aforesaid is north of the laundry.

The record shows that due diligence was used by the defendant previous to his trial to find all witnesses that might know any facts in his favor. Due inquiry was made up and down Fourth street, but no one learned or heard of Bradley knowing anything about the facts. The verdict in the case was rendered December 2, 1926, more than a year after the shooting occurred. Bradley's affidavit was made December 16, 1926. The newly discovered evidence of Bradley is in the nature of cumulative evidence. It does not impress us as such evidence as would have had weight enough with the jury to cause them to return a verdict of not guilty for the defendant. The evidence makes a very strong case against the defendant, largely by reason of the facts and circumstances established by the testimony of Ling and Byrd, which are nearly all admitted by the defendant. There can be no doubt of the truth of the fact that Ling instantly recognized the defendant when he came into his laundry and that he apprehended trouble when he saw him, and this is shown by the fact that he immediately stood up and asked him why he had come there. The defendant's story that he paid Byrd $30 to go to Springfield to collect a debt Ling owed him and would not pay him theretofore is unreasonable. The facts and circumstances show clearly that he went to Springfield, armed with one or two revolvers, to kill Ling. Bradley's affidavit sets up an unreasonable state of facts in this: that while everybody else on that morning who knew or had heard of the shooting appeared to be at the scene of the shooting, Bradley, who had known Ling for three years, was not interested

enough in him and did not have his curiosity sufficiently aroused by the shooting to even join or mix with the crowd that had gathered there to learn the fate of Ling. Newly discovered evidence must be evidence that is material to the issues of the case. It must not be merely cumulative, but convincing that an unjust verdict has been rendered and that a different verdict would in all probability be rendered by another jury, before it can be regarded as sufficient to warrant the court to set aside the verdict and grant a new trial. *People* v. *Williams*, 242 Ill. 197.

The intent to kill and murder Leong Ling was clearly shown by the evidence. Such intent may be determined by the facts and circumstances proved on the trial, including the declarations or acts of the defendant. (*People* v. *Guilfoyle*, 321 Ill. 93; *People* v. *Makovicki*, 316 id. 407.) The People were properly allowed to prove that prior to the time of the shooting the defendant had threatened to kill the prosecuting witness if he did not quit the laundry business in Springfield. It is not absolutely necessary to prove a motive for a killing in order to show that the killing was a crime, but evidence that tends to show that the defendant had a motive for assaulting and killing the person he did assault and kill is always relevant, as it renders more probable the inference that he did commit the assault and the killing. (*People* v. *Strause*, 290 Ill. 259.) So evidence of threats made prior to the commission of a crime is relevant to show malice, and if made long before the crime is committed it tends to show deliberation and due meditation. *Schoolcraft* v. *People*, 117 Ill. 271; *Westbrook* v. *People*, 126 id. 81.

We have examined the instructions given in this case and also those of the defendant which were refused. By the instructions given for the People and for the defendant the court fully instructed the jury as to the law of the case. The court was warranted in refusing the instructions that it did refuse on the ground that they were not applicable

327—26

to the case, or were repetitions of those given, or were improperly drawn and likely to be misleading to the jury.

The prosecuting attorney in making his argument to the jury drew conclusions from a portion of the evidence that were not warranted. We do not think that the evidence shows any preparation or intent on the part of the defendant to carry with him a second gun to resist the officers of the law if they attempted to arrest him after the shooting. The defendant, however, was not prejudiced by the remarks.

There is no reversible error in the record, and the judgment is affirmed.

*Judgment affirmed.*